

# SEALED

**Office of the United States Attorney**
District of Nevada
333 Las Vegas Boulevard, Suite 5000
Las Vegas, Nevada 89101
(702) 388-6336

DANIEL G. BOGDEN
United States Attorney
ROGER YANG
Assistant United States Attorneys
333 Las Vegas Blvd. South, Ste. 5000
Las Vegas, Nevada 89101
(702) 388-6336 / Fax (702) 388-6698

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
-oOo-

IN THE MATTER OF THE EXTRADITION ) Case No.: 2:14-mj-314-CWH
OF MOHAMMAD SAFDAR GOHIR. )
)  COMPLAINT FOR PROVISIONAL
)  ARREST WITH A VIEW TOWARDS
)  EXTRADITION
)  (18 U.S.C. § 3184)
)
)
)

I, the undersigned Assistant United States Attorney, being duly sworn, state on information and belief that the following is true and correct:

1. I represent the United States in fulfilling its treaty obligation to Germany;

2. There is an extradition treaty in force between the United States and Germany entitled the Extradition Treaty between the United States and Germany, which was signed on June 20, 1978, and which entered into force on August 29, 1980 (TIAS 9785).

3. The treaty provides in article 16 for the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents;

4. In accordance with article 16 of the treaty, the Government of Germany has asked the United States for the provisional arrest of Mohammad Safdar Gohir with a view towards his extradition;

5. According to the information provided by the requesting state, Mohammad Safdar Gohir was charged with jointly-committed tax evasion in a particularly serious case, in violation of the Fiscal Code of Germany, Section 370, subsection 1 no. 1, subsection 3 no. 2 and 5, Sections 149 and 150, susbsection 2, and 34, involving tax evasion; and in violation of Sections 25 susbsection 2, and 53 of the German Criminal Code, for offenses committed within the jurisdiction of Germany; and a warrant for his arrest was issued on May 4, 2014, by the District Court of Frankfurt, at Frankfurt, Germany;

6. The warrant was issued on the basis of the following facts:

### Value Added Tax System

Germany collects revenue from a Value Added Tax ("VAT"). Every time a business buys a good, it is charged an input tax, and every time it sells a good, it charges the customer an output tax. Businesses are supposed to pass the net VAT they collect (output tax minus the input tax) to the government. Exports of goods, however, are tax free, and exporters are able to reclaim any input tax charged by the buyer abroad from the government because there is no output tax on an export within the European Union.

Imported goods are "zero-rated" in the country of origin (there is no input or output tax). The importer (Company A) charges a subsequent domestic buyer (Company B) an output tax (which becomes the input tax to Company B). At this point, Company A should give the entire amount of output tax to the German revenue authority, because it paid no input tax when it imported the good. If Company B re-sells the good to another domestic company, (Company C), Company B charges Company C an output tax, and should give the German revenue authority the difference between the output tax it charges Company C and the input tax it paid to Company A. If Company C then exports the good, it can recover the input tax it paid to Company B from

the government. In short, output VATs should always be paid to the government, and companies can recover input VATs from the government.

**GOHIR**

Between approximately August 2009 until May 2010, Mohammad Safdar Gohir ("Gohir"), along with co-defendants Ashraf Muhammad and Mobeel Iqbal, was the leader of a gang formed for the purpose of establishing a VAT carousel fraud scheme by means of companies systematically connected in a series and apparently trading in CO2 emission allowances. Using these companies, Gohir and his co-defendants evaded turnover taxes totalling EUR 136,563,336, with the aim and purpose of creating a permanent source of income in the range of several millions. As such, Gohir and his co-defendants were responsible for the companies named "Vektor Energie GmbH" with registered office in Frankfurt, Main, and "Roter Stern GmbH" with registered office in Munich, "Tageslicht Umweltsysteme GmbH" with registered office in Frankfurt, Main and "Energie Intelligenz GmbH" with registered office in Berlin.

The persons charged with the offenses concerned are those behind the VAT chain fraud scheme, while Gohir was the head of the gang and Mohammad as well as Iqbal were his closest associates and confidants within the gang. Based on a joint criminal plan, they initiated the present VAT chain fraud scheme, by creating the fraud chains and steering the companies within this fraud chain as they wished.

In this connection, emission allowances were sometimes traded through VAT fraud chains extremely quickly with a view to evading taxes, while at the beginning of such a chain, the CO2 emission allowances were bought by natural persons or companies abroad via companies in Germany without any VAT amount required to be paid. Acting in accordance with a joint criminal plan pursued by the perpetrators cooperating in a chain of services, the

3

companies that imported the CO2 emission allowances to Germany and resold them to domestic companies (the so-called missing traders), failed to comply with their obligation and did not file advance turnover tax returns at all or filed incorrect turnover tax returns, but made out invoices with openly listed turnover tax to the domestic buyers of the allowances (the so-called buffers) who were meant to use the stated turnover tax when claiming input tax in case of checks by the fiscal authorities.

In particular, the companies named "7 Days Import & Export UG", "AK Weltweit Handel GmbH", "Bauelemente Hansa GmbH", "Bavaria Finanzvermittlungs AG", "Blue Pearl Trading GmbH", "DCS Diamond Communications Systems GmbH", "DGU Unternehmensberatung GmbH", and "STARTEAK GmbH" were the first domestic companies that were involved in the invoice chain as so-called missing traders, that issued invoices for the transfer of emission allowances with turnover tax listed therein and that neither filed advance turnover tax returns nor paid turnover taxes.

In accordance with a joint criminal plan pursued by the perpetrators cooperating in a chain of services, the buffers included within the trade chain served the purpose of concealing the turnover tax fraud chain. Inconspicuous companies from a tax-related point of view were usually involved, which - at first sight - complied with their obligations to declare and pay taxes. The advance turnover tax returns filed by these companies usually stated low turnover taxes required to be paid as far as their sales and purchase prices were concerned. The buffers sold the CO2 emission allowances within this fraud chain to companies that in turn, at the end of fraud chain, exported the emission allowances to other European countries (the so-called distributors).

Besides further companies, the companies named "Vektor Energie GmbH", "Roter Stern GmbH", "Tageslicht Umweltsysteme GmbH", and "Energie Intelligenz GmbH" acted as buffers within the invoice chain. In this context, the companies named "Tageslicht Umweltsysteme

4

GmbH" and "Energie Intelligenz GmbH" mainly neither acted as first buffers within the invoice chain - hence directly after the missing traders - nor as final buffers – hence immediately before the distributor - but between the other two buffers. However, the companies named "Vektor Energie GmbH" and "Roter Stern GmbH" acted as the final buffers within the invoice chain and immediately supplied to the distributor.

The distributor - in the present case, almost exclusively DEUTSCHE BANK AG - in turn received from these business transactions apparently legal and high input tax refund claims (without turnover taxes required to be paid) vis-à-vis the tax authorities, and these claims - through the payment of turnover tax to the final buffer before the distributor, were taken and received by the organisers of the trade chain as profits or used for the new acquisition of $CO_2$ emission allowances abroad. Thus, DEUTSCHE BANK AG Frankfurt transferred the $CO_2$ emission allowances acquired from the VAT fraud chains to DEUTSCHE BANK AG London, which in turn sold the allowances to companies with registered offices outside Germany. It was from these sales transactions that DEUTSCHE BANK AG of Frankfurt claimed input tax refunds from the tax authorities of Hessen within the three-digit million range.

Each time the $CO_2$ emission allowances went through the trade chains, the trade chains served no other economic purpose than evading turnover taxes by the participants in the trade chain insofar as the participants in the trade chain unjustly claimed input tax based on the invoices issued to them. The companies "Vektor Energie GmbH", "Roter Stern GmbH", "Tageslicht Umweltsysteme GmbH", and "Energie Intelligenz GmbH" were only formed for this purpose. The present VAT chain fraud in which the companies steered by the accused persons were also involved was identified by Frankfurt, Main regional court - 2nd economic crime division (Landgericht Frankfurt am Main – 2. Wirtschaftsstrafkammer) with final and binding effect.

In this connection, the persons charged with the offenses concerned, Gohir, Muhammad, and Iqbal, were acting as members of a professionally organised and internationally acting gang, and they were those who were on top of the hierarchy of the gang. As stated above, Gohir was the boss of the gang and the person in control of and behind the present VAT fraud scheme. He was the investor, initiator, and co-organiser of the present VAT fraud scheme in which he was involved with the companies named "Vektor Energie GmbH", "Roter Stern GmbH", "Tageslicht Umweltsysteme GmbH", and "Energie Intelligenz GmbH".

Through his co-defendants Muhammad and Iqbal, Gohir controlled the central office in Dubai, the so-called "Head Office", from which an organization point of view, consisted of the companies named "MP Solutions FZE" and "Vision Marketing & Management FZCO"; it was from there that the entire VAT fraud chain - also along with the four companies mentioned above - was controlled. Gohir staffed the "head office" with his confidants: his cousin Muhammad, and Iqbal, and had them do the daily business as agreed with them. In this context, he was informed of all procedures of relevance and was involved when difficulties occurred.

In particular, the company named "MP Solutions FZE" served to feed $CO_2$ emission allowances in the trade chain to the companies named "Gesellschaften Vektor Energie GmbH", "Roter Stern GmbH", "Tageslicht Umweltsysteme GmbH", and "Energie Intelligenz GmbH". In agreement with Gohir, the accused person Muhammad – who also was the managing director of the company named "MP Solutions FZE" – and the accused person Iqbal controlled the entire trade volume and the flow of emission allowances within the entire trade chain through the "MP Solution" company. In an effort to avoid catching the attention of the investigating authorities, Gohir acted behind the scenes by not having an official position in any of these companies. However, Gohir made the strategic decisions within the gang, and in individual cases, he involved himself in the daily business such as, inter alia, in connection with the sentenced person

Arfan Khan. For example, he took care of the witness Arfan Khan when opening the company named "Energie Intelligenz GmbH" and gave the latter instructions several times.

Together with Iqbal and Muhammad, Gohir controlled the payment transactions within the trade chain. In this context, for example, First Bancorp Ltd. with bank accounts in Cyprus and Hong Kong, Gohir and his co-defendants created a payment platform in an offshore state where they had access to the funds obtained from the VAT chain fraud, because payments by the companies involved were usually transferred to the aforementioned offshore accounts of First Bancorp Ltd.

Gohir, acting jointly with Muhammad and Iqbal, also used other persons as gang members for subordinate activities, such as, inter alia, Mudasser Rafiq aka "Mad", who is prosecuted separately, and who- acting upon the orders of the aforementioned accused persons- was to recruit further persons to serve as managing directors of the involved companies in Germany.

The managing directors used by them were taken care of and controlled by "Mad" at the local level as agreed. The task of the directors, deployed on site of the companies Vektor Energie GmbH, Tageslicht Umweltsysteme GmbH, Energie Intelligenz GmbH, Roter Stern GmbH and Better Business Systems GmbH – namely the already convicted individuals Fraz Mir, Arfan Khan, Ijaz Khan and the separately prosecuted individuals Faisal Ahmad and Umaran Bashir – was particularly but not exclusively to appear to be a legitimate business vis-à-vis the German Finance Authorities and to protect the individuals behind the scenes. In reality, the trading operations in emissions certificates for these companies were actually carried out by Muhammad and Iqbal - in consultation with Gohir.

All emissions certificates acquired during the period of the offenses by Gohir, Muhammad and Iqbal, originated in this chain of invoices from one of the above specified

7

1  missing traders which means that the input tax claimed based on the respective purchase invoices
2  was claimed illegitimately. Due to the fact that the co-defendants were aware of the fact that the
3  companies Vektor Energie GmbH, Roter Stern GmbH, Tageslicht Umweltsysteme GmbH and
4  Energie Intelligenz GmbH were involved in the VAT fraud chains and due to the fact that the co-
5  defendants were well aware of their scheme, they were not allowed to claim input tax based on
6  the purchase invoices received by the companies. The VAT specified in the sales invoices of the
7  respective companies were owed in accordance with section 14c (2) VAT Act [UStG]; this also
8  applies to the VAT amounts resulting from the credit notes received by them.
9  Specifically, the charges are outlined as follows:
10 **Vektor Energie GmbH (Counts 1 through 7)**
11 Between 09 October 2009 and 07 April 2010, Vektor Energie GmbH filed advance VAT returns
12 for the 7 advance return periods from September 2009 until March 2010 and declared a turnover
13 of EUR 306,812,483.00, which is subdivided in the below table, input tax of EUR 57,854,417.81
14 and a payable VAT amount of EUR 439,957.02. The input tax amounts from invoices for the
15 acquisition of $CO_2$ certificates from the companies involved in the VAT carousel fraud were
16 falsely claimed. They amounted to at least EUR 46,440,247.01. The accused evaded VAT in this
17 amount by arranging that input tax was falsely claimed in the mentioned amount.
18 In detail:

| Acts/ Advance return period | Date of advance return | Turnover | Input tax | Payable VAT amount | VAT evaded of the involved companies |
|---|---|---|---|---|---|
| September 09 | 09.10.2009 | 5.087.199,00 € | 959.488,65 € | 7.079,37 € | 718.378,00 € |
| October 09 | 10.11.2009 | 81.875.339,00 € | 15.443.770,44 € | 112.544,61 € | 9.385.910,70 € |
| November 09 | 09.12.2009 | 73.897.749,00 € | 13.934.905,41 € | 105.667,50 € | 10.222.751,50 € |
| December 09 | 11.01.2010 | 43.741.449,00 € | 8.249.555,76 € | 61.319,98 € | 7.076.409,50 € |

| | | | | | |
|---|---|---|---|---|---|
| January 10 | 09.02.2010 | 46.477.999,00 € | 8.760.756,41 € | 70.063,87 € | 8.760.756,00 € |
| February 10 | 08.03.2010 | 20.332.499,00 € | 3.832.069,89 € | 31.105,23 € | 3.602.169,00 € |
| March 10 | 07.04.2010 | 35.400.249,00 € | 6.673.871,25 € | 52.176,46 € | 6.673.871,00 € |
| amount | | 306.812.483,00 € | 57.854.417,81 € | 439.957,02 € | 46.440.247,01 € |

**Roter Stern GmbH (Counts 8 through 14)**

Between 09 October 2009 and 08 April 2010, Roter Stern GmbH filed advance VAT returns for the 7 advance return periods from August 2009 until February 2010 and declared a turnover of EUR 308,301,618.00, which is subdivided in the below table, input tax of EUR 58,390,890.61 and a payable VAT amount of EUR 186,416.81. The input tax amounts from invoices for the acquisition of $CO_2$ certificates from the companies involved in the VAT carousel fraud were falsely claimed. They amounted to at least EUR 58,390,888.92. The accused evaded VAT in this amount by arranging that input tax was falsely claimed in the mentioned amount.

In detail:

| Acts/ Advance return period | Date of advance return | Turnover | Input tax | Payable VAT amount | VAT evaded of the involved companies |
|---|---|---|---|---|---|
| August 09 | 09.11.2009 | 3.789.023,00 € | 714.861,11 € | 5.053,26 € | 714.861,00 € |
| September 09 | 09.11.2009 | 6.927.200,00 € | 1.306.504,36 € | 9.663,64 € | 1.306.504,00 € |
| October 09 | 03.12.2009 | 46.510.045,00 € | 8.777.714,24 € | 59.194,31 € | 8.777.714,00 € |
| November 09 | 05.01.2010 | 69.100.250,00 € | 13.098.510,42 € | 30.537,08 € | 13.098.510,92 € |
| December 09 | 08.02.2010 | 62.878.600,00 € | 11.913.190,28 € | 33.743,72 € | 11.913.190,00 € |
| January 10 | 04.03.2010 | 87.409.000,00 € | 16.570.386,47 € | 37.323,53 € | 16.570.386,00 € |
| February 10 | 08.04.2010 | 31.687.500,00 € | 6.009.723,73 € | 10.901,27 € | 6.009.723,00 € |
| amount | | 308.301.618,00 € | 58.390.890,61 € | 186.416,81 € | 58.390.888,92 € |

9

**Energie Intelligenz GmbH (Counts 15 through 19)**

Between 10 November 2009 and 20 April 2010, Energie Intelligenz GmbH filed advance VAT returns for the 5 advance return periods from September 2009 until December 2009 and March 2010 and declared a turnover of EUR 22,443,239.00, which is subdivided in the below table, input tax of EUR 4,258,883.48 and a payable VAT amount of EUR 14,430.47. The input tax amounts from invoices for the acquisition of $CO_2$ certificates from the companies involved in the VAT carousel fraud were falsely claimed. They amounted to at least EUR 4,258,883.48. The accused evaded VAT in this amount by arranging that input tax was falsely claimed in the amount of EUR 4,604,609.06.

In detail:

| Acts/ Advance return period | Date of advance return | Turnover | Input tax | Payable VAT amount | VAT evaded of the involved companies |
|---|---|---|---|---|---|
| September 09 | 10.11.2009 | 1.941.200,00 € | 365.736,13 € | 3.091,87 € | 365.736,00 € |
| October 09 | 12.11.2009 | 2.118.200,00 € | 401.113,35 € | 1.344,65 € | 401.113,00 € |
| November 09 | 04.01.2010 | 1.032.000,00 € | 195.487,48 € | 592,52 € | 195.487,00 € |
| December 09 | 10.03.2010 | 890.900,00 € | 168.968,11 € | 302,89 € | 168.968,00 € |
| March 10 | 20.04.2010 | 16.460.939,00 € | 3.127.578,41 € | 9.098,54 € | 3.473.305,06 € |
| amount | | 22.443.239,00 € | 4.258.883,48 € | 14.430,47 € | 4.604.609,06 € |

**Tageslicht Umweltsysteme GmbH (Counts 20 to 26)**

Between 27 October 2009 and 25 February 2010, Tageslicht Umweltsysteme GmbH filed advance VAT returns for the 6 advance return periods from September 2009 until February 2010; for the advance return period of March 2010 it failed to file an advance VAT return although it would have been obligated to do so by 10 April 2010 at the latest as VAT in the amount of EUR 8,543,483 was invoiced to other companies. It declared a turnover totalling EUR 95,650,320, which is subdivided in the below table, input tax totalling EUR 18,692,079.86 and a payable

10

VAT amount totalling EUR 45,405.53. The input tax amounts from invoices for the acquisition of $CO_2$ certificates from the companies involved in the VAT carousel fraud were falsely claimed. The accused also failed to file VAT totalling EUR 18,629,511.80, which had been falsely invoiced to other companies, thus evading VAT of at least EUR 27,127,591.44.

In detail:

| Acts/ Advance return period | Date of advance return | Turnover | Input tax | Payable VAT amount | VAT evaded of the involved companies | Acts/ Advance return period |
|---|---|---|---|---|---|---|
| September 09 | 27.10.2009 | 1.504.200,00 € | 282.529,96 € | 3.268,04 € | 748.752,00 € | 745.483,96 € |
| October 09 | 11.11.2009 | 1.957.620,00 € | 370.127,31 € | 1.820,49 € | 479.791,80 € | 477.791,31 € |
| November 09 | 30.12.2009 | 14.438.700,00 € | 2.735.301,31 € | 8.051,69 € | 2.743.353,00 € | 2.735.301,40 € |
| December 09 | 28.01.2010 | 24.382.350,00 € | 5.175.685,50 € | 10.599,01 € | 4.632.464,50 € | 4.622.047,49 € |
| January 10 | 28.01.2010 | 27.240.450,00 € | 5.164.305,78 € | 11.379,72 € | 5.175.685,50 € | 5.164.305,78 € |
| February 10 | 25.02.2010 | 26.127.000,00 € | 4.964.130,00 € | 10.286,58 € | 4.849.465,00 € | 4.839.178,50 € |
| March 10 | Obligated 10.04.2010 | - € | - € | - € | - € | 8.543.483,00 € |
| amount | | 95.650.320,00 € | 18.692.079,86 € | 45.405,53 € | 18.629.511,80 € | 27.127.591,44 € |

The evidence in the case is comprised of the following:

- Accounting documents of the four aforementioned companies, specifically outgoing invoices, incoming invoices and credit notes in connection with transactions in the emissions trade, and the overviews of the emission trade accounts of Energie Intelligenz GmbH in the German and the Danish Emissions Trading Registry
- confessed statements of Fraz Mir, Arfan Khan, and Ijaz Khan, who have meanwhile

11

1     been convicted and have implicated Gohir;

2 - Fraz Mir and Arfan Khan have positively identified photographs of Gohir, including

3     Gohir's passport photograph provided to the Department of Justice;

4 - telecommunications interceptions and surveillance measures;

5 - seized Skype communication between the persons accused and other persons who are the

6     subject of separate proceedings;

7 - statements made by the witnesses Amtsrat Kuschel, Amtsrat Weinelt, and Steueramtmann

8     Evers; and

9 - other extensive investigations and findings of the tax investigation authorities

10     (Steuerfahndung) and the Federal Criminal Police Office (Bundeskriminalamt).

12  7.     The offenses with which Mohammad Safdar Gohir is charged are provided for in article 2

13 of the extradition treaty cited above;

14  8.     Mohammad Safdar Gohir may be found within the jurisdiction of this court at the Las

15 Vegas McCarran International Airport;

16  9.     The requesting state has requested that arresting authorities seize all items which may

17 serve as evidence, including electronic media, found on or about the person of Gohir at the time

18 of his arrest, or discovered subsequently, pursuant to Article 25 in the treaty;

19  10.     The requesting state has represented that it will submit a formal request for extradition,

20 supported by the documents specified in the treaty, within the time required under the treaty; and

21  11.     Mohammad Safdar Gohir would likely flee if he learned of the existence of a

22 warrant for his or her arrest.

23     WHEREFORE, the undersigned complainant requests that a warrant for the arrest of the

24 person named above be issued in accordance with Title 18, United States Code, Section 3184,

and the Extradition Treaty between the United States and Germany, and that this complaint and the warrant be placed under the seal of the court, except as disclosure is needed for its execution, until such time as the warrant is executed.

*Roger Yy*
Assistant United States Attorney

Sworn to before me and subscribed in my presence this 4th day of May, 2014, at ___1157___.

United States Magistrate Judge