1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * * * * * * * * * * * * * *

IN THE MATTER OF THE EXTRADITION OF     )
    MOHAMMAD SAFDAR GOHIR.     )     Case No. 2:14-mj-00314-CWH
                  )
                  )     **ORDER FOR CERTIFICATION**
                  )     **OF EXTRADITION**
_____ )

      Before the Court is a request for extradition under 18 U.S.C § 3184 brought by the Government of Germany ("Germany") against Mohammed Safdar Gohir ("Gohir"). Germany seeks the extradition of Gohir for his alleged participation in a tax fraud scheme involving value added taxes ("VAT"). Pursuant to the extradition treaty between the United States (or "the Government") and Germany, the United States acts on behalf of Germany in this matter. *See* Extradition Treaty between the United States and the Republic of Germany.[1]

**BACKGROUND**

      On May 4, 2014, the United States submitted a complaint for provisional arrest with a view towards the extradition of Gohir, at the request of Germany to fulfill the United States' treaty obligation to Germany. *See* Compl. at ¶ 1. The complaint indicates that the treaty "provides in article 16 for the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents[.]" *Id*. ¶¶ 2, 3. The complaint also indicates that "the Government of Germany has asked the United States for the provisional arrest of [Gohir] with a view towards his extradition[.]" *Id*. ¶ 4. The complaint alleges that, based on "the information provided by the requesting state," an arrest warrant was issued in Germany on May 4, 2014 "by the District Court of Frankfurt, at Frankfurt, Germany[.]" *Id*. ¶ 5. The complaint states that Gohir "was charged with jointly-committed tax evasion . . . in violation of Fiscal Code of Germany, Section 370, subsection 1 no. 1, subsection 3 nos. 2 and 5, Sections 149 and 150, subsection 2, and 34, involving tax evasion; and in violation of Sections 25 subsection 2, and 53 of

the German Criminal Code, for offenses committed within the jurisdiction of Germany[.]" *Id.* The complaint sets forth extensive factual allegations (approximately 11 pages) underlying the issuance of the warrant in Germany. *Id* ¶ 6, at 2-12. The complaint also references the evidence in this case, which includes: (1) accounting documents, (2) confessed statements of others convicted on similar charges implicating Gohir, (3) positive photographic identification of Gohir by witnesses, (4) seized communications between the persons accused and others, and (5) witness statements. *Id.* at 11:19 - 12:10. The complaint notes that the charges are extraditable under Article 2 of the extradition treaty, and that Germany "has represented that it will submit a formal request for extradition, supported by the documents specified in the treaty, within the time required under the treaty[.]" *Id.* ¶¶ 7, 9. After reviewing the complaint, this Court determined the terms of the extradition treaty between the United States and Germany, and because provisional arrest had been met, an arrest warrant was issued.

On May 4, 2014, the U. S. Marshal Service arrested Gohir at McCarran International Airport in Las Vegas. Following a requested continuance, on May 6, 2014, Gohir was arraigned on the complaint, and counsel moved for bail. The Court announced its intent to release Gohir on his own recognizance and the government requested a stay, which was granted, to May 12, 2014. The issues regarding bail and compliance with treaty obligations were extensively addressed in Gohir's Brief on Bail and Detention (#8), filed May 9, 2014; the Government's Response and Memorandum in Opposition to Bail (#9), filed May 9, 2014; and Gohir's Reply Brief (#11), filed May 12, 2014. After considering the briefs, along with the parties' arguments raised at the hearings in this matter, the Court ordered Gohir detained pending further proceedings. On May 13, 2014, Gohir's counsel appealed the May 12, 2014 detention order to the district judge, which was denied on May 14, 2014. (Gohir v. United States, Case no. 2:14-cv-748 JCM-CWH, Doc. 1).[2] In response, Gohir filed a writ of habeas corpus, which was denied on June 30, 2014. (Gohir v. Hoye, et.al., Case no. 2:14-cv-760 GMN-VCF, Docs. 1 and 18). Then, on June 13, 2014, pursuant to Article 16(4) of the Treaty, the U.S. Department of State approved the request for an additional 20 days to present the request for extradition. (#33). The formal notice of extradition was filed by the Government on July 2, 2014. (#37). On or about July 18, 2014, the Government filed, on behalf of

1    Germany, copies of the extradition request, along with supporting documents and translations of
2    those documents.  (# 43-53).   Meanwhile, at the conferences on July 7, 2014 and July 29, 2014, the
3    parties discussed the status of the case, Gohir's medical concerns, and Gohir's access to his
4    extradition documents.  A status hearing scheduled for August 28, 2014 was continued at Gohir's
5    request and conducted on September 22, 2014.  At a status hearing on November 12, 2014, the
6    parties scheduled the extradition hearing for January 26, 2015.  Gohir has made no argument that
7    this matter was not expeditiously processed.

8         Having received the extradition documents, this Court now determines whether it is
9    "sufficient to sustain the charge under the provisions of the proper treaty or convention." 18 U.S.C.
10   § 3184.  If the Court finds the evidence sufficient, it must "certify the same" to the U.S. Secretary
11   of State, who decides whether to surrender the fugitive "according to the treaty." *Id*.  The Court
12   conducted a hearing under the provisions of 18 U.S.C. § 3184 on January 26, 2015.   No testimony
13   or other evidence was offered other than Court Exhibit 1, but Gohir presented extensive arguments
14   regarding the matter.

15                                        **DISCUSSION**

16        Extradition from the United States is governed by 18 U.S.C. § 3184, which confers
17   jurisdiction on "any justice or judge of the United States," or any authorized magistrate judge, to
18   conduct an extradition hearing under the relevant extradition treaty between the United States and
19   the requesting nation. The purpose of the extradition hearing is to determine whether a person
20   arrested pursuant to a complaint in the United States on behalf of a foreign government is subject to
21   surrender to the requesting country under the terms of the pertinent treaty and relevant law. *See* 18
22   U.S.C. § 3184; *In re Extradition Lanzani*, No. CV 09-07166-GAF (MLG), 2010 WL 625351, at *4
23   (C.D. Cal. Feb. 18, 2010).

24        To surrender the person to the requesting country, the Court must determine that each of the
25   following requirements have been met: (1) the extradition magistrate has jurisdiction to conduct the
26   extradition proceedings; (2) the extradition magistrate has jurisdiction over the fugitive; (3) an
27   extradition treaty is in full force and effect; (4) the crime is extraditable; (5) there is probable cause
28   to believe that the individual appearing before the magistrate judge has committed the crimes

alleged by the requesting nation; and (6) there are no applicable treaty provisions that bar the extradition for any of the charged offenses. *See Lanzani*, 2010 WL 625351, at *4 ; *see also Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

If the requirements are met, the extradition magistrate judge must certify the individual as extraditable to the U.S. Secretary of State and issue a warrant of commitment. *See Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1208 (9th Cir. 2003). Once such a certification has been made, "it is the Secretary of State, representing the executive branch, who determines whether to surrender the fugitive." *Id.*; 18 U.S.C. § 3184. Extradition is a matter of foreign policy entirely within the discretion of the executive branch, and "the executive branch's ultimate decision on extradition may be based on a variety of grounds, ranging from individual circumstances, to foreign policy concerns, to political exigencies." *Blaxland*, 323 F.3d at 1208. Thus, the authority of the extradition magistrate is limited to the judicial determination required by § 3184. In other words, the magistrate judge "has no discretionary decision to make." *Lopez-Smith v. Hood*, 121 F.3d 1322, 1326 (9th Cir. 1997).

In the present case, the parties do not dispute the following: the existence of an extradition treaty, that Gohir is the person sought by Germany, that the offense charged is extraditable, that documents were properly presented, and there are no treaty bars to extradition. According to Gohir, the issues in dispute are whether: (1) the offense charged satisfies the requirement of "double criminality," (2) there is sufficient and credible evidence to support probable cause to believe the relator committed the offenses charged, and (3) treaty requirements and statutory procedures were observed. The Court now determines whether the present case satisfies the *Lanzani* factors while also taking into account the issues in dispute.

**1.      The extradition magistrate has jurisdiction to conduct extradition proceedings**

Section 3184 provides that extradition proceedings may be conducted by, among others, any magistrate judge authorized by a court of the United States. Nevada Local Rule 1B 1-9(u) also provides that a magistrate judge is authorized to perform any additional duties not inconsistent with the Constitution and the laws of the United States. In light of this authority, and given that Gohir does not dispute this Court's jurisdiction over the present matter, the Court finds it has jurisdiction

to conduct extradition proceedings in the instant case.

**2.      The extradition magistrate has jurisdiction over the fugitive**

It is well settled that a court has jurisdiction over a fugitive found within its jurisdictional boundaries.  *See* 18 U.S.C. § 3184 (A court may, upon complaint made under oath charging any person found within that court's jurisdiction, issue a warrant for the apprehension of the person charged).  Because Gohir is found within this Court's boundaries, and Gohir admits he is the person sought by Germany, this Court has jurisdiction over Gohir.

**3.      The extradition treaty is in full force and effect**

The Government has produced an affidavit from the Office of the Legal Adviser for the U.S. Department of State attesting that there is a treaty between the United States and the Republic of Germany in full force and effect.  Gohir makes no argument to the contrary. As such, the U.S. Department of State's determination is entitled to deference from this Court.  *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Then v. Melendez*, 92 F.3d 851, 854 (9th Cir. 1996); Court Exhibit 1.

**4.      The crime is extraditable (under the "dual criminality" requirement)**

Article 1 of the Treaty provides for the return of fugitives charged with or convicted of an "extraditable offense," as that term is defined in Article 2 of the Treaty.  Under the Appendix to the Treaty, TIAS 9785, item 27, "Offenses relating to willful evasion of taxes and duties" are extraditable.  Under Article 2(2), "Extradition shall be granted in respect of an extraditable offense (a) For prosecution, if the offense is punishable under the laws of both Contracting Parties by deprivation of liberty for a maximum period exceeding one year..."  In other words, the offense must be a felony in the United States.

"[U]nder the doctrine of 'dual criminality,' an accused person can be extradited only if the conduct complained of is considered criminal by the jurisprudence or the laws of both the requesting and requested nations."  *Quinn v. Robinson,* 783 F.2d 776, 783 (9th Cir. 1986).  The dual criminality principle is incorporated into Article 2(1) of the Treaty, as amended, which states that:

Extraditable offenses under the Treaty are offenses which are punishable under the laws of

5

both Contracting Parties.  In determining what is an extraditable offense it shall not matter whether or not the laws of the Contracting Parties place the offense within the same category of offenses or denominate an offense by the same terminology, or whether dual criminality follows from Federal, State, or Laender (sic) laws.

Consequently, the Court examines the description of criminal conduct provided by Germany to determine whether that conduct would be criminal under U.S. law.

A requesting country is neither obligated to produce evidence of all elements of a criminal offense, nor required to establish that its crimes are identical to those found in the United States. *Kelly v. Griffin*, 241 U.S. 613, 615 (1916).  Rather, an adequate extradition proceeding must include in its record a specific delineation, as to each charge, of the legal theories under the requesting country's laws by which the accused's conduct is alleged to constitute an extraditable offense, together with an identification of the corresponding offenses in this country relied on to show that the "dual criminality" requirement has been met.  *See Caplan v. Vokes*, 649 F.2d 1336, 1344 (9th Cir. 1981); *see also Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998) ("[D]ifferences between statutes aimed at the same category of conduct do not defeat dual criminality.").  "[I]t is enough that the conduct involved is criminal in both countries." *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1404-05 (9th Cir. 1988).

The documents submitted by Germany[3]  establish that Gohir is wanted by Germany for trial on the charge of tax evasion.  These documents also define tax evasion and its punishment. Section 370, subsection 1, no.1, subsection 3, nos. 2 and 5, of the Fiscal Code of Germany prohibit tax evasion, and as the primary offense in this matter, will be discussed in greater detail below. Sections 149[4] and 150, subsection 2,[5] and 34[6], of the Fiscal Code of Germany, and sections 13, 15, and 18 of the German VAT Act,[7] do not contain penalty provisions but define or explain the tax evasion offense.  The German government has also provided the text of Section 53 of the German Criminal Code, Multiple Offences Committed by Multiple Acts,[8] which describes the enforcement of penalties.

The German government has also provided the text of Section 25, subsection 2, and Section 53, of the German Criminal Code, which explains the criminal liability of actors and co-actors. Section 25 of the German Criminal Code, Principals, provides:

6

(1)  Any person who commits the offence himself or through another shall be liable as a principal.

(2)  If more than one person commit the offence jointly, each shall be liable as a principal (joint principals).

Similar to the German statute, 18 U.S.C § 2 provides:

(a)  Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b)  Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Section 25 of the German Criminal Code therefore establishes criminal liability for principals, as does United States law under 18 U.S.C. § 2.

The basis for the allegation of tax evasion against Gohir is the violation of Section 370 of the German Tax Code, Tax Evasion which provides, in pertinent part:

(1) A penalty of up to five years' imprisonment or a monetary fine shall be imposed on whoever

1. Furnishes the revenue authorities or other authorities with incorrect or incomplete particulars concerning matters of substantial significance for taxation,

. . .

(3) In particularly serious cases, a penalty of between six months and ten years' imprisonment shall be imposed.  A case shall generally be deemed to be particularly serious where the perpetrator

. . .

2.  Abuses his authority or position as a public official,

. . .

5.  As a member of a group formed for the purpose of repeatedly committing acts pursuant to subsection (1) above, understates value-added taxes or excise duties or derives unwarranted VAT or excuse duty advantages.

The German Tax Code thereby imposes a criminal penalty on one who "Furnishes the revenue authorities or other authorities with incorrect or incomplete particulars concerning matters of substantial significance for taxation."  As set forth below, United States law similarly imposes a criminal penalty on one who "willfully attempts in any manner to evade or defeat any tax," or fails to collect or truthfully account for and pay over such tax."  Specifically, 26 U.S.C. § 7201 provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 100,000 ($ 500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

Moreover, 26 U.S.C. § 7202 provides:

7

1
2
3
> Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

4  The Court finds that the allegation of a violation of Section 370 subsection 1, no.1 of the

5  German Tax Code, Tax Evasion, meets the "dual criminality" requirement because it is an offense

6  punishable under the law of Germany, and is also a felony offense punishable under 26 U.S.C. §§

7  7201 and 7202 of the laws of the United States.  The elements of the offenses under the laws of

8  both countries appear to be similar and need not be identical for the duality analysis.  *See Kelly v.*

9  *Griffin*, 241 U.S., at 615.  It is enough that the conduct involved is criminal in both countries." *In*

10  *re Russell*, 789 F.2d 801, 803 (9th Cir. 1986).  Dual criminality exists if the "essential character" of

11  the acts criminalized by the laws of each country are the same and if the laws are "substantially

12  analogous."  *Theron v. United States Marshal*, 832 F.2d 492, 496 (9th Cir. 1987) (citation omitted).

13  The Court so finds.

14  Additionally, section 150 of the German Tax Code, Format and Contents of Tax Returns

15  provides, in pertinent part:

16
17
> (2) The information contained in the tax returns shall be the truth to the best of the declarant/u2019s (sic) knowledge and belief.  This shall be confirmed in writing where the form so requires.

18  The Court notes that 26 U.S.C. § 7206 also provides in pertinent part that it is a felony to

19  willfully make and subscribe a return which one does not believe is true:

20  Any person who–

21
22
> (1) Declaration under penalties of perjury. Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

23
24
25
26
> (2) Aid or assistance. Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; or

27
28
> . . .
> shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $ 100,000 ($ 500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

8

Section 370, subsections 3, nos. 2 and 5, further describe certain types of tax evasion which are alleged in this case, and provide the potential penalty for tax evasion "in particularly serious circumstances," that is, if a person abuses his authority as a public official,[9] or is a member of a group formed for the purpose of repeatedly committing acts of tax evasion by understating VAT or excise duties, or derives unwarranted VAT or excise duty advantages. The Court views these provisions as aggravating circumstances under Germany's tax evasion law, which mandates certain levels of punishment but need not satisfy the "dual criminality" requirement. Obviously, there is no VAT in the United States.

Sections 149, 150, Section 34, of the Fiscal Code of Germany and sections 13, 15, and 18 of the German VAT Act[10] do not contain penalty provisions but do establish standards for the submission of tax returns and therefore define and explain the offense, a requirement under Article 14 of the Treaty.

**5.     There is probable cause to believe that the individual appearing before the magistrate judge has committed the crimes alleged by the requesting nation**

**a.     Probable cause**

Germany alleges that Gohir violated its tax evasion laws during the period October 2009 to April 2010. Gohir agrees that he is the person sought by Germany, but contends that extradition should be denied because Germany has failed to present competent evidence establishing probable cause that he committed the alleged crime.

An extradition magistrate "does not weigh conflicting evidence and make factual determinations." *Quinn*, 783 F.2d at 815. The extradition proceeding "is designed only to trigger the start of criminal proceedings against an accused; guilt remains to be determined in the courts of the demanding country." *Valencia v. Limbs*, 655 F.2d 195, 198 (9th Cir. 1981). The Court must base a finding of probable cause on competent evidence to justify holding the accused to await trial. *Collins v. Loisel*, 259 U.S. 309, 316 (1922). The committing Court's function is merely to determine whether there is "any evidence warranting the finding that there was a reasonable ground to believe the accused guilty." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925); *see also Mirchandani v. United States*, 836 F.2d 1223, 1226 (9th Cir. 1988). Probable cause exists when

evidence is sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).  "The probable-cause standard is incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Rodis v. City & County of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009).

The rules of evidence, other than with respect to privilege, do not apply in extradition proceedings. *See* FED. R. EVID. 1101(d)(3); *Emami v. U.S. Dist. Court for the N. Dist. of Cal.*, 834 F.2d 1444, 1451 (9th Cir. 1987) ("In the Ninth Circuit it has been repeatedly held that hearsay evidence that would be inadmissable for other purposes is admissible in extradition proceedings."). The extradition court's "findings" are based almost entirely on affidavits, depositions, and other documentary evidence supplied by the requesting government.  *See* 18 U.S.C. § 3190 ("Depositions, warrants, or other papers or copies thereof shall be received and admitted as evidence").  To support a finding of probable cause, an affidavit must contain factual support for the affiant's conclusions and either an assertion that the affiant speaks from personal knowledge or a statement of the sources for the affiant's belief, along with the circumstances from which the affiant concluded that the sources were reliable and credible.  *In re Petition of France for Extradition of Sauvage*, 819 F. Supp. 896, 903 (S.D. Cal. 1993).

The basis for Germany's case is through a sworn statement by Public Prosecutor Konstantinos Passialis ("Prosecutor Passialis"), who is responsible for the prosecution of extensive and serious tax offenses, particularly in the areas of organized VAT crimes.  Gohir has not challenged the authenticity of Prosecutor Passialis' affidavit.

Article 29(a) of the Treaty sets forth the authentication requirements.  Documents emanating from Germany are authenticated if they "are signed by a [German] judge or competent officer, are authenticated by the official seal of the Federal Minister of Justice, and are certified by the competent diplomatic or consular officer of the United States in the Federal Republic of Germany." Article 29(a).  Prosecutor Passialis provided a summary of statements of witnesses allegedly involved in the crime, along with analysis and reports regarding documentary evidence seized in this matter.  Law enforcement summaries of statements of witnesses and the results of the

10

1   investigation are competent evidence in extradition proceedings. *Zanazanian v. United States*, 729

2   F.2d 624, 626 (9th Cir. 1984). The information contained in Prosecutor Passialis's statements, as

3   summarized below, form the basis for this Court's findings.

4       Prosecutor Passilis indicated that on April 28, 2010, searches, seizures and arrests took

5   place in twelve countries across Europe, based on approximately 400 search warrants issued by the

6   local court of Frankfurt am Main, and resulting in seven arrest warrants and numerous assets being

7   seized. Five persons were detained in Germany and other parts of Europe. A review of the

8   transaction data collected by the emission registries and the booking documents seized by tax

9   investigation officers showed that all allowances traded by MP Solutions FZE were traded by

10  German "missing traders" to the companies Tageslicht Umweltssysteme GmbH, Energie Intelligenz

11  GmbH, Roter Stern GmbH, and Vektor Energie GmbH, with the allowances later sold almost

12  exclusively to DeutcheBank, AG.

13      Germany collects revenue from VAT. Every time a business buys a good, it is charged an

14  input tax, and every time it sells a good, it charges the customer an output tax. Businesses are

15  expected to pass the net VAT they collect (output tax minus the input tax) to the German

16  government. Exports of goods are tax free, and exporters are able to reclaim any input tax charged

17  by the buyer abroad from the German government because there is no output tax on exports within

18  the European Union.

19      Prosecutor Passialis's sworn testimony alleges that a "VAT fraud chain" is a scheme by

20  which individuals illicitly recover VAT from the German government as "loot," and then divide the

21  proceeds among members of the gang. Between approximately August 2009 and May 2010, Gohir

22  was the leader of a gang, along with co-defendants Asraf Muhammad ("Muhammad") and Mobeel

23  Iqbal ("Iqbal") participating as members of that gang. The gang was formed for the purpose of

24  establishing a VAT carousel fraud scheme by means of companies systematically connected by a

25  network trading in carbon dioxide emission allowances. Using these companies, Gohir and his co-

26  defendants evaded turnover taxes totaling EUR 136,563,336. Gohir and his co-defendants were

27  allegedly responsible for the companies named Vektor Energie,  Roter Stern, Tageslicht

28  Umweltssysteme, and Energie Intelligenz.

According to Prosecutor Passialis, while Gohir led the gang, Mohammad and Iqbal were his closest confidants within that gang.  The gang initiated the VAT chain fraud scheme by creating the fraud chains and steering the companies within this fraud chain.  Records indicate that emission allowances were sometimes traded through VAT fraud chains extremely quickly with a view to evading taxes.  At the beginning of such a chain, the carbon dioxide emission allowances were bought by natural persons or companies abroad via companies in Germany without any VAT paid.  The companies that imported the emission allowances to Germany and resold them to domestic companies (i.e., "missing traders") failed to comply with their obligations by not filing advance turnover tax returns, or filing incorrect turnover tax returns and issuing invoices with openly listed turnover taxes to the domestic buyers of the allowances (i.e., "buffers") who were meant to use the turnover taxes when claiming input taxes.

Records indicate the companies named 7 Days Import & Export UG, AK Weltweit Handel GmbH, Bauelemente Hansa GmbH, Bavaria Finanzvermittlungs AG, Blue Pearl Trading GmbH, DCS Diamond Communications Systems GmbH, DGU Unternehmensberatung GmbH, and STARTEAK GmbH were the first domestic companies involved in the invoice chain as "missing traders," and issued invoices for the transfer of emission allowances with turnover taxes listed therein.  These companies neither filed advance turnover tax returns, nor paid turnover taxes.

In accordance with the alleged joint criminal plan pursued by the perpetrators cooperating in a chain of services, the buffers included within the trade chain concealed the turnover tax fraud chain.  Inconspicuous companies from a tax-related point of view were usually involved, which apparently complied with their obligations to declare and pay taxes.  The advance turnover tax returns filed by these companies usually stated low turnover taxes for payment as far as sales and purchase prices were concerned.  The buffers sold the emission allowances within this fraud chain to companies that, in turn, at the end of the fraud chain, exported the emission allowances to other European countries (i.e., "distributors").

The companies Vektor Energie, Roter Stern, Tageslicht Umweltssysteme, and Energie Intelligenz acted as buffers within the invoice chain.  In this context, the companies Tageslicht Umweltssysteme and Energie Intelligenz neither acted as first buffers within the invoice chain, i.e.,

12

directly after the missing traders, nor as final buffers, i.e., immediately before the distributors. Rather, they acted between other buffers.  However, the companies Vektor Energie and Roter Stern acted as final buffers within the invoice chain and immediately supplied the distributor.

According to Prosecutor Passialis, the distributor in the present case, almost exclusively DeutcheBank AG, in turn received from these business transactions legal and high input tax refund claims without turnover taxes having to be paid to tax authorities, and these claims, through payment of turnover tax to the final buffer before the distributor, were obtained by the organizers of the trade chain as profits or used for the new acquisition of emission allowances abroad. DeutcheBank transferred the emissions allowances acquired from the VAT fraud chains to DeutcheBank, London, which in turn sold the allowances to companies with registered offices outside Germany.  It was from these sales transactions that DeutcheBank, Frankfurt claimed input tax refunds from the tax authorities of Hessen within the three-digit million range.

Prosecutor Passialis indicated that each time the emission allowances went through the trade chains, the trade chains served no other economic purpose than to allow participants in the trade chain to evade turnover taxes by unjustly claiming input taxes based on the invoices issued to them.  The companies Vektor Energie, Roter Stern, Tageslicht Umweltssysteme, and Energie Intelligenz were formed only for this purpose.

Gohir and his co-defendants were allegedly acting as the top hierarchy of a professionally organized gang.  Gohir was alleged to be the boss of the gang, and the person behind and in control of the VAT scheme.  Through his co-defendants Muhammad and Iqbal, Gohir controlled the central office in Dubai, which consisted of MP Solutions FZE and Vision Marketing & Management FZCO.  It was in Dubai that Gohir controlled the entire VAT fraud chain, along with the other four companies.

Prosecutor Passialis alleges that the company named MP Solutions served to feed emission allowances in the trade chain to the companies Vektor Energie, Roter Stern, Tageslicht Umweltssysteme, and  Energie Intelligenz.  In agreement with Gohir, Muhammad, who was also managing director of MP Solutions, and Iqbal, director of IT, controlled the entire trade volume and flow of emission allowances within the entire trade chain through MP Solutions.  Gohir acted

13

1  behind the scenes and made strategic decisions, but sometimes involved himself in daily decisions.

2      Together with Iqbal and Muhammad, Gohir controlled the payment transactions within the

3  trade chain using bank accounts at First Bancorp Ltd. Gohir and his co-defendants created a

4  payment platform in an offshore state where they had access to funds obtained from the VAT chain

5  fraud because payments by the companies involved were usually transferred to the offshore

6  accounts at First Bancorp Ltd.

7      Gohir, acting jointly with Muhammad and Iqbal, also used other persons for subordinate

8  activities, such as Mudasser Rafiz ("Mad"), who acted upon their orders and recruited persons to

9  serve as managing directors of the companies involved in Germany.

10     All emission certificates acquired during the period of the offenses by Gohir, Muhammad,

11  and Iqbal originated in this chain of invoices from one of the missing traders, which means that the

12  input tax claimed based on the respective purchase invoices was claimed illegitimately.  Because

13  Gohir's co-defendants were aware that the companies Vektor Energie, Roter Stern, Tageslicht

14  Umweltssysteme, and Energie Intelligenz were involved in the VAT fraud chains, they did not

15  claim input taxes based on the purchase invoices received by these companies.

16     Prosecutor Passialis' statements indicate that accounting documents of the four companies,

17  specifically, outgoing invoices, incoming invoices, credit notes in connection with transactions in

18  the emissions trade, and overviews of the emission trade accounts of Energie Intelligenz and

19  Danish Emission Trading Registry, which were analyzed by the officers of tax investigation

20  authorities, showed that Energie Intelligenz, Vektor Energie, Tageslicht Umweltssysteme, and

21  Roter Stern evaded taxes in the amounts described.  This Court notes that such evidence is hearsay,

22  but nevertheless may be considered. *Zanazanian v. United States*, 729 F.2d 624, 626 (9th Cir.

23  1984) (To eliminate hearsay from extradition proceedings would run counter to one of the primary

24  objectives of bilateral extradition treaties, namely, "to obviate the necessity of confronting the

25  accused with the witnesses against him; . . . [Requiring] the demanding government to send its

26  citizens to another country to institute legal proceedings would defeat the whole object of the

27  treaty.").  Prosecutor Passialis also indicated that in three separate trials, the Frankfurt Court found

28  that the claim fraud existed, and entered judgments on December 21, 2011, April 15, 2014, and

14

1    April 24, 2014.  Eight individuals have been convicted in these trials.  The Frankfurt Court

2    purportedly made findings regarding the roles of co-actors Muhammad and Iqbal.  In particular, the

3    Frankfurt Court found that Muhammad and Iqbal controlled the trading volume and channels of the

4    allowances via MP Solutions within the fraudulent trading scheme.

5           This Court now considers evidence provided by Prosecutor Passialis regarding each of the

6    four companies controlled by Gohir.

7           **Vektor Energie**.  On December 21, 2011, Fraz Mir ("Mir") was sentenced to a term of

8    imprisonment of four years for severe tax evasion in relation to his management of Vektor Energie.

9    Prosecutor Passialis summarized the statements of Mir, who indicated that he went to Germany for

10   the purpose of setting up a company to trade in emissions allowances with Gohir's organization.

11   Mir has known Gohir since childhood.  Mir acquired a company, Vektor Energie, and he became

12   its managing director.  To further his ability to trade emission allowances, Mir obtained EUR

13   20,000 for Vektor Energie from a bank account controlled by Gohir.  Mir was to obtain emission

14   allowances from the company Better Business Systems GmbH, managed by Umaran Bashir, who is

15   currently in German custody.  Working in conjunction with Muhammad, Mir conducted the

16   transactions at the direction of Muhammad and Gohir.  Mir admitted that the transactions were not

17   genuine, but were on Gohir's direction.  Counts 1 through 7 allege that between October 9, 2009

18   and April 7, 2010, Vektor Energie filed advance VAT returns for the seven advance return periods

19   from September 2009 until March 2010, and declared a turnover of EUR 306,812,483, input tax of

20   EUR 57,854,417, and payable VAT amount of EUR 439,957.  The input tax amounts from invoices

21   for the acquisition of carbon dioxide certificates from the companies involved in the VAT carousel

22   fraud were falsely claimed.  The input tax amounted to at least EUR 46,440,247.  Gohir and his co-

23   defendants evaded the VAT by falsely claiming this amount as input tax.

24          **Roter Stern**.  According to Prosecutor Passialis, the interrogation of Iftikhar Ali ("Ali")

25   revealed information regarding the participation of Gohir, a person well-known to Ali through

26   family relations.  Ali was aware that Gohir had organized a group of individuals who could

27   undertake emission allowances trading for the purpose of VAT evasions in Germany, with Ali's

28   nephew, Faisal Ahmad ("Ahmad"), serving as managing director for Roter Stern.  Ali indicated that

the pivotal company in these transactions was MP Solutions FZE.  Muhammad, Gohir's cousin, is the registered director of MP Solutions, with Iqbal serving as is its IT Officer.  Iqbal also controlled bank accounts and emission trading registry accounts for the companies involved.   Ali indicated that research for trading was conducted by Gohir's employees at Vision Marketing & Management FZCO, a company officially offering web design and marketing services, and which created the Internet pages for Energie Intelligenz, Tageslicht Umweltssysteme, Roter Stern, and Vektor Energie.  Ali indicated that financial services for the fraud chain were provided by First Bancorp Ltd., which was controlled by Gohir.  First Bancorp Ltd. had bank accounts in Hong Kong and Cyprus, which is where funds were transferred from the companies involved in the fraud scheme.  Skype communications linked the transactions between Vektor Energie, Tageslicht Umweltssysteme, Better Business Systems, and Roter Stern, as well as Gohir.  Ahmad, managing director of Roter Stern, has not yet been arrested.   Counts 8 through 14 allege that between October 9, 2009 and April 8, 2010, Roter Stern filed advance VAT returns for the 7 advance return periods from August 2009 until February 2010, and declared a turnover of EUR 308,301,618, input tax of EUR 58,390,890, and a payable VAT amount of EUR 186,416.  The input tax amounts of invoices from acquisition of carbon dioxide certificates involving the companies in the VAT carousel fraud were falsely claimed.  The input tax amounted to at least EUR 58,390,888.  Gohir and his co-defendants evaded the VAT by falsely claiming this amount as input tax.

**Energie Intelligenz.**  The criminal judgment of April 15, 2014 against Arfan Khan ("Khan"), which resulted in his imprisonment for 2 years, 9 months for severe tax evasion also raised findings related to the central role of one "Uncle Saff," who is supposedly Gohir.  Prosecutor Passialis summarized the statements of Khan, which indicated that in 2009, at the request of Gohir, Khan went to Germany and acquired a company that became Energie Intelligenz, with Khan serving as its managing director.  Expenses for setting up the company, along with Khan's travel expenses to Germany, were paid by Gohir.  Khan received instructions from Gohir to purchase emission allowances from Better Business Systems GmbH.  Communications were conducted by Skype.  Khan was later contacted by Muhammad and Iqbal, who both handled daily business activities, along with Gohir who made the important business decisions.  Khan had nothing to do

with the actual trades performed by the company, but he ensured that funds from transactions were transferred to accounts at First Bancorp Ltd. in Hong Kong and Cyprus, respectively.  After the April 28, 2010 seizure of assets, Gohir told Khan that he would have to pay Gohir the EUR 6.2 million that was seized.  Counts 15 through 19 allege that between November 10, 2009 and April 20, 2010, Energie Intelligenz filed advance VAT returns for the 5 advance return periods from September 2009 until December 2009, and declared a turnover of EUR 22,443,239, input tax of EUR 4,258,883, and a payable VAT amount of EUR 14,430.  The input tax amounts from the acquisition of carbon dioxide certificates involving the companies in the VAT carousel fraud were falsely claimed.  The input tax amounted to at least EUR 4,258,883.  Gohir and his co-defendants evaded the VAT by falsely claiming this amount as input tax.

**Tageslicht Umweltssysteme.**  On April 24, 2014, Ijaz Khan ("Ijaz") was sentenced for severe tax evasion to a total term of 4 years and 2 months in prison.  According to Prosecutor Passialis,  Ijaz stated he was sent to Germany in May or June 2009 by an associate of Muhammad and Iqbal named "Mad."  Ijaz was located in Dubai, and acquired and served as managing director of Tageslicht Umweltssysteme for the purpose of trading emission allowances.  Ijaz received instructions on renting facilities, setting up registry accounts, and opening bank accounts.  Ijaz never made any transactions on his registry accounts, and transferred funds either to a domestic bank or an offshore account.  Ijaz was also made aware that Roter Stern was an additional purchaser of allowances.  Ijaz communicated by Skype with Gohir, whose Skype name was "Boss."  Counts 20 through 26 allege that between October 27,  2009 and February 25, 2010, Tageslicht Umweltssysteme filed advance VAT returns for the 6 advance return periods from September 2009 to February 2010.  For the advance return period of March 2010, Tageslicht Umweltssysteme failed to file an advance VAT return although it would have been obligated to do so by April 10, 2010 at the latest, as VAT in the amount of EUR 8,543,483 was invoiced to other companies.  Tageslicht Umweltssysteme declared a turnover of EUR 95,650,320, input tax totaling EUR 18,692,079, and a payable VAT amount of EUR 45,405.  The input tax amounts of invoices from the acquisition of carbon dioxide certificates involving the companies in the VAT carousel fraud were falsely claimed.  Gohir and his co-defendants failed to file VAT totaling EUR

18,629,511, which had been falsely invoiced to other companies, thus evading VAT of at least EUR 27,127,591.

The Court reviewed examples, provided by Prosecutor Passialis, of numerous Skype communications and the wiretapped conversations of Gohir and others.  Of particular note are the conversations on April 10, 2014 regarding information that Ijaz provided to the authorities about Gohir, which confirms Gohir's knowledge about the relationship between Ijaz and the tax evasion gang, and Gohir's concern about what Ijaz might have told the authorities about his role in that gang.

The Court finds there is probable cause to believe that Gohir has committed the offense of tax evasion, in violation of Section 370 of the German Tax Code, subsection (1).  The primary evidence of tax evasion lies in the documents seized, reviewed, and summarized by German and other law enforcement officers, and presented by Prosecutor Passialis to this Court.  The summaries include the date of the returns, the amount of turnover, input tax, payable VAT amounts, the amounts evaded, and statements that the documents which supported the returns were false.

At the hearing, Gohir's counsel argued extensively that the computations provided to the Court did not add up, but counsel also conceded that he did not have the returns or the invoices to verify his calculations.  *See e.g.*, Hearing transcript at 108-09 (#79).  Of course, argument is not evidence, and the Court may not interpret German law.  At an extradition hearing, Gohir could only have offered evidence that tends to explain the Government's case of probable cause.  *Hooker v. Klein*, 573 F.2d 1360, 1368 (9th Cir. 1978).

The Court finds competent the evidence described by Prosecutor Passialis, specifically, that the tax authorities studied the seized documents and provided the analysis upon which Prosecutor Passialis relies.  Germany, the country seeking extradition, is not required to produce all of its evidence at an extradition hearing, and it is not this Court's role to determine whether there is sufficient evidence to convict Gohir.  *See Quinn,* 783 F.2d at 815 (The magistrate judge does not weigh conflicting evidence and make factual determinations; rather, the judge determines only whether there is competent evidence to support the belief that the accused has committed the charged offense.).

Prosecutor Passialis presented evidence of self-incriminating statements by Mir, Khan, Ijaz, and Ali indicating that Gohir, by himself and jointly with others, including Muhammad and Iqbal, in violation of Section 370 of the German Tax Code, furnished "the revenue authorities or other authorities with incorrect or incomplete particulars concerning matters of substantial significance for taxation." Self-incriminating statements of accomplices are sufficient to establish probable cause in an extradition hearing. *Curreri v. Vice*, 77 F.2d 130, 132 (9th Cir. 1935).

Counsel for Gohir argued the evidence fails to demonstrate that tax evasion acts alleged against Gohir were wilful, and therefore Gohir may not be extradited under the dual criminality requirement. This Court disagrees. There is probable cause to believe that Gohir and his co-actors knowingly submitted false invoices to claim input taxes as part of the VAT fraud scheme, and therefore wilfulness is sufficiently demonstrated by Gohir and his co-actors. To knowingly submit false returns would violate a known legal duty to submit truthful and accurate returns. *See United States v. Murdock*, 290 U.S. 389, 396 (1933) (Simple failure to maintain adequate records is not sufficient to sustain criminality); *United States v. DeTar*, 822 F2d 1110, 1114 (9th Cir. 1987) (For a felony conviction, there must be proof of willfulness in the sense of a specific intent to evade or defeat the tax or its payment.")

There is probable cause to believe that Sections 149, 150(2), and 34 were violated because the returns that were filed for the four companies reportedly were based upon knowingly false information. The submission of returns is presumably the responsibility of the managing directors, who were placed into their positions by, and under the control of, Gohir and his co-defendants. The Court further finds that there is probable cause to believe that the combined and repeated actions of the co-defendants were undertaken with the intent to evade VAT reporting and payment obligations. The evasion was wilful because the documentary evidence indicated that the input tax amounts from the invoices were falsely claimed, and the managing directors were put into place by Gohir and his co-defendants for that purpose. Because of the individual roles and close interrelationships of the various actors, the Court further finds there is probable cause to believe that Gohir committed the particularly more serious offense, under subsection (3), subsection 5, of acting "as a member of a group formed [and leading that group] for the purpose of repeatedly

1  committing acts pursuant to subsection (1) above, [by] understating value-added taxes or excise
2  duties or deriv[ing] unwarranted VAT or excise duty advantages," in violation of Section
3  370(1)(3)5.

4  **b.     Rule of Specialty**

5  Article 22(1) provides that a "a person who has been extradited under this Treaty shall not
6  be proceeded against, sentenced, or detained with a view to carrying out a sentence or detention for
7  any offense committed prior to his surrender other than that for which he was extradited."  The
8  Rule of Specialty is a doctrine based on international comity that prevents the country requesting
9  the extradition of a fugitive from prosecuting the fugitive for crimes other than those for which he
10 was extradited unless the country from which the fugitive was extradited consents to the
11 prosecution. *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986).

12 Here, as discussed above, the Court has found that there is probable cause to believe that
13 Gohir has committed the particularly serious offense of tax evasion of the VAT as part of a gang.
14 The Court was unable, however, to identify any evidence regarding the aggravated offense of tax
15 evasion by a public official who abuses his authority, in violation of Section 370, subsection 1(3)
16 subsection 2, because it does not appear that Gohir, or any of his co-actors, is a public official.
17 Accordingly, under the Rule of Specialty, the Court will not certify the prosecution of that
18 aggravating factor.

19 **6.     Applicable treaty provisions barring extradition for the charged offenses**

20 **a.     Subject Matter Jurisdiction**

21 Gohir challenged whether the U.S. Government had official authorization to request a
22 provisional arrest warrant on May 4, 2014, and whether this Court had subject matter jurisdiction to
23 issue a provisional arrest warrant.  The Court previously analyzed these issues and found both that
24 the arrest was appropriate and that the Court had subject matter jurisdiction.  (#22).  At the
25 extradition hearing, Gohir again argued that the arrest warrant issued in Frankfurt, Germany, and
26 used to support the complaint for provisional arrest, cannot form the basis for a provisional arrest
27 warrant under the Treaty or 18 U.S.C. § 3184 because the request for a provisional arrest warrant
28 was not made between the U.S. Department of Justice and the Minister of the Federal Republic of

Germany, as required under Article 16 of the treaty.  Article 16(1) of the extradition treaty between

the United States and Germany provides:

> In case of urgency, either Contracting Party may apply for the provisional arrest of the person sought before the request for extradition has been submitted to the Requested State through the diplomatic channel. The request for provisional arrest may be made either through the diplomatic channel or directly between the United States Department of Justice and the Minister of the Federal Republic of Germany.

There is no dispute that this subsection authorizes provisional arrest **before** a formal

extradition request is submitted through diplomatic channels.  Under the express terms of Article

16, the provisional arrest "shall be terminated" if the "Requested State" does not receive the

extradition request "within a period of 40 days" after the provisional arrest. *See* Extradition Treaty

at Article 16(4).  The "Requesting State" may apply for an additional 20 days to submit the request.

*Id*.

The requirements for provisional arrest are expressly set forth in Article 16(2) of the Treaty,

which states:

> The application for provisional arrest shall state that a warrant of arrest as mentioned in paragraph 3(a) of Article 14 . . . exists and that it is intended to make a request for extradition. It shall also state the offense for which extradition will be requested and when and where such offense was committed and shall give all available information concerning the description of the person sought and his nationality. The application shall also contain such further information, if any, as would be necessary to justify the issuance of a warrant of arrest in the Requested State had the offense been committed, or the person sought convicted, in that State.

Gohir's objection is directed toward the arrest warrant identified within the complaint and whether

it issued from an appropriate source, not whether the complaint provides the requisite information

as identified in Article 16(2).  Article 16 clearly contemplates the viability of the arrest warrant

identified within a complaint for provisional arrest, which is evaluated by reference to "paragraph

3(a) of Article 14[,]" and provides:

> A warrant of arrest issued by a judge of the Requesting State and such evidence as, according to the law of the Requested State, would justify his arrest and committal for trial if the offense had been committed there, including evidence proving that the person requested is the person to whom the warrant of arrest refers[.]

*See* Extradition Treaty, Article 14(3)(a).  All that is required under Article 16 for provisional arrest

is an application that a "warrant of arrest as mentioned in paragraph 14(3)(a)" exists. The term

"warrant of arrest issued by a judge of the Requesting State" is not defined within the treaty, but

21

Gohir concedes that the arrest warrant identified in the complaint was issued by a German judge. Gohir simply does not believe it was a judge with requisite authority. The issuing judge was, in Gohir's counsel's terms, a "low-level" judge. The treaty does not identify at what "level" of the judicial hierarchy within Germany the issuing judge must reside.  It simply states that "a warrant of arrest issued by a judge of the Requesting State."  There is no requirement anywhere within Article 16 or Article 14(3)(a) that the arrest warrant be issued by the Minister of Justice of the Federal Republic of Germany.  It is sufficient that the arrest warrant exists, that it issued from a German judge, and that it is intended to make a request for extradition. The extradition papers indicate that a magistrate judge in Frankfurt issued an arrest warrant on May 2, 2014.  The Court finds that the complaint for provisional arrest adequately sets forth the requirements for provisional arrest under Article 16 of the Treaty.

Gohir also objected that the request for provisional arrest was not made either through diplomatic channels or directly between the U.S. Department of Justice and the Minister of the Federal Republic of Germany.  At a hearing on May 6, 2014, the Assistant United States Attorney representing the United States indicated that, based upon his discussions with the Department of Justice's Office of International Affairs, the provisional arrest had been made by officials in the German government.  The Court found that the requirements of the Treaty had been met.  Gohir continued to object at subsequent hearings that the Court lacked subject matter jurisdiction in this matter because no evidence had been provided of the official communication between the Republic of Germany and the United States.

At the extradition hearing on January 26, 2015, the Court was provided, for the first time, with an affidavit of Assistant United States Attorney Marcus Busch ("AUSA Busch").  *See* Court Exhibit 1.  The affidavit had been referred to in the previously filed Writ of Habeas Corpus case before Chief Judge Navarro (*Gohir v. Hoye*, Case no. 2:14-cv-760 GMN-VCF, Doc. 26, "Government's Response to Fugitives Request for Rule 60 Relief).  Apparently, through clerical error, the affidavit was not attached to the Government's Response in that case, and upon discovering that error, Gohir and this Court were provided the document in open court during the January 26, 2015 hearing on this matter.

1    AUSA Busch's affidavit states that, on May 4, 2014, the German Ministry of Justice

2    through its Federal Office of Justice, requested Gohir's provisional arrest to the U.S. Central

3    Authority by electronic mail from Dr. Karitzky, the head of Germany's Federal Office of Justice

4    extradition office.  The affidavit further indicates that the German government believed the need

5    for the arrest was urgent because Gohir was scheduled to depart the United States to return to

6    London on that day.  The Court therefore finds that the request for provisional arrest was made

7    directly between the U.S. Department of Justice and the Minister of the Federal Republic of

8    Germany, in satisfaction of Article 16.  It is clear that at the time of the filing of the provisional

9    arrest request, the Court had jurisdiction over this case.  *See Grupo Dataflux v. Atlas Global Grp.,*

10   *LP.*, 541 U.S. 567, 570-571 (2004) (Jurisdiction of the court depends upon the state of things at the

11   time the action is brought.).  Accordingly, the Court finds it has subject matter jurisdiction.

12   **b.    Urgency for provisional arrest**

13   Additionally, Gohir argues the absence of urgency justifying his provisional arrest because

14   he was scheduled to return to London when he was arrested in Las Vegas on May 4, 2014.  The

15   complaint for provisional arrest indicated that Gohir would likely flee if he learned of the existence

16   of the warrant for his arrest.  *See* Compl. at ¶ 11.  Prosecutor Passialis indicated that, on April 10,

17   2014, after the results of the investigations against Gohir were compiled by tax investigators, a

18   tapped phone conversation of Gohir revealed that he was concerned, due to the detention of his co-

19   actors who were directors of the various companies discussed herein, that he may have become the

20   focus of the investigations.  For this reason, Gohir discussed whether it might be better for him to

21   "break away for some time."  Prosecutor Passialis believed that may have meant fleeing to a

22   country such as the United Arab Emirates, where Gohir is a resident of Dubai, and hiding out there

23   because the United Arab Emirates has, so far, not extradited any individuals to Germany for a white

24   collar crime.  As a consequence, an arrest warrant was quickly requested by German authorities

25   because the suspicion against Gohir had considerably increased, and there was probable cause to

26   believe that he had committed the offenses, especially once Khan and Ijaz were convicted on April

27   15 and April 24, 2014, respectively.  Based upon probable cause, the magistrate judge in Germany

28   issued an arrest warrant on May 2, 2014.  It is true, as argued by Gohir, that Gohir was returning to

London on May 4, 2014 when he was arrested, but Gohir was not aware that the warrant had been issued.  Had he been aware, he was certainly capable of immediately arranging travel to Dubai instead of London.  Thus, the Court finds there was sufficient urgency to issue the provisional arrest warrant because it was reasonable to believe that Gohir might flee to Dubai in the near future.

## CONCLUSION AND ORDER

Accordingly, **IT IS HEREBY ORDERED** that, pursuant to 18 U.S.C. § 3184, Mohammad Safdar Gohir is found extraditable and this matter is certified to the U.S. Secretary of State so that a warrant may issue upon the requisition of the proper authorities of the government of Germany for the surrender of Mohammad Safdar Gohir according to the Extradition Treaty for the violation of laws prohibiting tax evasion.

**IT IS FURTHER ORDERED** that Mohammad Safdar Gohir, along with all seized mobile phones, computers, data carriers, various electronic memory devices, seized writings, and other documents, is committed pursuant to 18 U.S.C. § 3184 to the custody of the U.S. Marshal Service, or its authorized representative, there to remain until surrender is made.

**IT IS FURTHER ORDERED** that this District's Clerk of Court shall forward an original or certified copy of this certification to the U.S. Secretary of State by way of the following person and address:

Elizabeth M.M. O'Connor
Attorney Advisor
Office of the Legal Advisor
Law Enforcement and Intelligence
U.S. Department of State
2201 C Street, N.W.
Washington D.C. 20520

DATED:  March 19, 2015.

C.W. Hoffman, Jr.
**United States Magistrate Judge**

24

**Endnotes**:

1. In this case, the Extradition Treaty ("Treaty") refers to the Extradition Treaty with the Republic of Germany signed on June 29, 1978 U.S. - F.R.G., 32 U.S.T 1485; the Supplementary Extradition Treaty with Germany signed on March 11, 1993; and the Second Supplementary Extradition Treaty with Germany signed on June 25, 2003.

2. The District Judge dismissed the appeal without prejudice, noting that it was procedurally infirm, and noting that the fugitive must "obtain relief after Magistrate Judge Hoffman issues an order on this matter" through the writ of habeas corpus and entered judgment in favor of the Government. (2:14-cv-748 JCM-CWH, Doc. 4, Doc. 5.)

3. Article 14(2) of the Treaty provides: The (extradition) request shall be accompanied by: ... b) The text of all applicable provisions of law of the Requesting State concerning the definition of the offense, its punishment and the limitation of legal proceedings or the enforcement of penalties;....

4. Section 149 of the German Tax Code, Submission of tax returns provides:

> (1) The tax laws shall determine the persons obliged to submit a tax return.  Any person invited by the revenue authority to submit a tax return shall also be required to do so.  The invitation may be issued by way of public notification.  The obligation to submit a tax return shall remain even where the revenue authority has estimated the basis of taxation (section 162).

> (2) Unless otherwise stipulated in the tax laws, tax returns relating to a calendar year or a legally determined period shall be submitted at the latest five months after expiration of such.  For taxpayers who calculate profit from agricultural and forestry activity from a financial year which deviates from the calender year, the period shall not end before expiration of the fifth month following the end of the financial year which began in the calendar year.

5. Section 150 of the German Tax Code, Format and Contents of Tax Returns provides, in pertinent part:

> (2) The information contained in the tax returns shall be the truth to the best of the declarant's (sic) knowledge and belief.  This shall be confirmed in writing where the form so requires.

6. Section 34 of the German Tax Code, Obligations of Legal Representatives and Asset Managers provides, in pertinent part:

> (1) The legal representatives of natural and legal person, and the managing directors of associations of person and conglomerations of assets without legal capacity shall fulfil the tax obligations of these entities.  In particular, they shall ensure that taxes are paid from the funds they manage.

7. Section 13 of the German VAT Act, Generation of Tax provides:

> (1) Tax is generated out of

> 1. Deliveries and other services
> (A) in calculation of tax based on consideration agreed (s.16 ss.1, sentence 1) upon the expiry of the advance return period in which the performances haven (sic) executed.  This also applies to partial performances.  Partial performances are given if for a certain part of an economically divisible performance the consideration has been agreed upon separately.  If the consideration or a part of the consideration is received before the performance or partial performance has been executed, tax is generated upon expiry of the advance return period, in which the consideration or partial consideration has been received;
> (B) calculation of tax on the basis of received considerations (s.20) with expiry of the advance return period, in which the consideration has been received;

( c) in cases of individual transport taxation as in s. 16 ss. 5 at the moment when the autobus reaches the inland,

( c) (sic) in the case of s.18 ss.4c with the expiry of the taxation period as in s. 16 ss 1a sentence 1, in which the services have been executed;

2. For performances in the sense of s. 3 ss 1b and 9a with expiry of the advance return period in which those performances have been executed;

3. In the case of s. 14c ss. 1 at the moment when the tax on the delivery or other services as in no. 1 lit. b sentence 1 generates but latest at the moment of the issue of invoice;

4. In the case of 2. 14c ss. 2 at the moment of the handing out of invoice;

5. In the case of s. 17 ss. 1 sentence 2 with expiry of the advance return period in which changes in the assessment basis have occurred;

6. For Intra-Community acquisition of new vehicles in the sense of s. 1b on the day of purchase;

7. For Intra-Community acquisition of new vehicles in the sense of s. 1b on the day of purchase;

8. In the case of s. 6a ss. 4 sentence 2 at the moment when delivery is executed;

9. In the case of s. 4 no. 4a sentence 1 lit. a sentence 2 with the expiry of the advance return period in which the good is removed from a VAT warehouse. (2) In the case of import-turnover-taxation s. 21 ss. 2 applies.

Section 15 of the German VAT Act, Input tax deduction

(1) The entrepreneur is allowed to deduct the following input tax:

1. The statutorily owed tax for delivery or other services carried out by a different company for his company. A precondition for performing the deduction of input tax is that the entrepreneur is in the possession of an invoice issued in accordance with s. 14, s 14a. Should the separately stated tax amount be related to a payment made prior to effecting the turnover, it is already deductible if the invoice is on hand and payment has been made.

2. Import-turnover-tax for goods imported for his company in accordance with s. 1 ss. 1 no. 4;

3. Tax for the Intra-Community purchase of goods for his company, if the Intra-Community purchase was performed in accordance with s. 3d sentence 1 in Germany;

4. Tax for services in the sense of s. 13b ss. 1 and 2 that were carried out for his company. Should a tax refer to a payment before execution of this service, it can be deducted if payment has been made;

5. Tax owed in accordance with s. 13a ss.1 no. 6 for turnover that was performed for his company. Any delivery, import or Intra-Community purchase of goods which the entrepreneur uses for less that 10 percent for his company is not considered to be carried out for the company.

Section 18 of the German VAT Act, Taxation procedure

(1) The entrepreneur has until the 10th day after the expiry of the advance tax return period electronically to submit an advance tax return in the officially prescribed form according to the regulations of the tax-data-transfer act; in this he has to calculate the tax due for the advance return period (prepayment) by himself; upon application for the purpose of avoidance of unjust hardships the tax office can relinquish the use of electronic transfer. S. 16 ss. 1 and 2 and s. 17 apply accordingly. Prepayment is due on the 10th day after expiry of the return period.

(2) Advance return period is the calendar quarter. If the tax for the preceding quarter exceeds 6,139 Euro the advance return period is the calendar month. If the tax for the preceding calendar year does not exceed 512 Euro the tax office can exempt the entrepreneur from the obligation to issue an advance return and relieve him from advances tax payment. If the entrepreneur has executed his commercial or professional activity only in a part of the preceding calendar year, the actual tax has to be re-assessed into a tax amount covering a full year's period. If the entrepreneur takes up his professional or commercial activities, then in the running and the following calendar year the advance return period is the calendar month.

(2a) If the entrepreneur can instead of a calendar quarter select a calendar month as the advance return period, if in the preceding year a surplus of more than 6,139 Euro in his favour is generated. In this case the

entrepreneur has to file advance return covering the first calendar month until 10th of February of the current calendar year.  Exercising this selection right is binding the entrepreneur for the calendar year's time.

(3) The entrepreneur has to file tax return according to a legally prescribed form covering a year or a short taxation period and in this form to calculate by himself the payable tax amount or return amount generating in his favour, according to s. 6 s. 1 through 4 and s. 17 (tax return).  In the cases of s. 16 ss. 3 and 4 tax return has to be filed within one month after expiry of the shortened taxation period.  The tax return has to be signed by the entrepreneur himself.

(4)  If in this form the entrepreneur calculates the tax or return in deviation from the advance payment amount, the difference in favour of the tax office is due one month after the receipt of the tax return.  If the tax office assesses the tax payable or the surplus in deviation from the tax return for one calendar year, the difference in favor of the tax office is due one month after notification of the tax assessment.  The usual due-dates of payable advanced payments (ss. 1) remain unaffected by sentences 1 and 2.

(4a) Advance return (subs 1 and 2) and tax return (subs 3 and 4) also have to be filed by entrepreneurs and legal bodies who have to exclusively pay taxes on turnovers as in s. 1 subs. 1 no. 5, s. 13b ss. 2 or s. 25b ss. 2 and by suppliers of vehicles (s. 2a).  Advance returns have to be filed only for the advance return periods in which tax on these turnovers has to be declared.  Application of ss. 2a is excluded.

8. (1) If a person has committed more than one offence, all of which are to be adjudicated at the same time, and incurred more than one sentence of imprisonment or more than one fine, an aggregate sentence shall be imposed.

(2) If a term of imprisonment concurs with a fine, an aggregate sentence shall be imposed.  The court may impose a separate fine; if fines are to be imposed for more than one offence, an aggregate fine shall to that extent be entered.

(3) If the offender, pursuant to a law according to which section 43a is applicable or under the terms of section 52(4), has as one of the individual sentences incurred imprisonment for life or a fixed term of more than two years, the court may impose a confiscatory expropriation order in addition to the aggregate sentence formed pursuant to subsections (1) and (2) above; if in such cases a confiscatory expropriation order is to be imposed for more than one offence, an aggregate expropriation order shall to that extent be imposed.  Section 43a(3) shall apply mutatis mutandis.

(4) Section 52(3) and (4) 2nd sentence shall apply mutatis mutandis.

9.  As discussed herein, the Court is unaware of any evidence which provides probable cause to believe that this "public official" provision of German law has been violated.

10.  Section 13 of the German VAT Act, Generation of Tax provides:
(1) Tax is generated out of
1. Deliveries and other services
(A) in calculation of tax based on consideration agreed (s.16 ss.1, sentence 1) upon the expiry of the advance return period in which the performances haven (sic) executed.  This also applies to partial performances.  Partial performances are given if for a certain part of an economically divisible performance the consideration has been agreed upon separately.  If the consideration or a part of the consideration is received before the performance or partial performance has been executed, tax is generated upon expiry of the advance return period, in which the consideration or partial consideration has been received;

(B) calculation of tax on the basis of received consideration s (s.20) with expiry of the advance return period, in which the consideration has been received;
( c) in cases of individual transport taxation as in s. 16 ss. 5 at the moment when the autobus reaches the inland,
( c) (sic) in the case of s.18 ss.4c with the expiry of the taxation period as in s. 16 ss 1a sentence 1, in which the services have been executed;
2. For performances in the sense of s. 3 ss 1b and 9a with expiry of the advance return period in

27

which those performances have been executed;

3.  In the case of s. 14c ss. 1 at the moment when the tax on the delivery or other services as in no. 1 lit. b sentence 1 generates but latest at the moment of the issue of invoice;

4.  In the case of 2. 14c ss. 2 at the moment of the handing out of invoice;

5. In the case of s. 17 ss. 1 sentence 2 with expiry of the advance return period in which changes in the assessment basis have occurred;

6.  For Intra-Community acquisition of new vehicles in the sense of s. 1b on the day of purchase;

7.  For Intra-Community acquisition of new vehicles in the sense of s. 1b on the day of purchase;

8.  In the case of s. 6a ss. 4 sentence 2 at the moment when delivery is executed;

9.  In the case of s. 4 no. 4a sentence 1 lit. a sentence 2 with the expiry of the advance return period in which the good is removed from a VAT warehouse. (2) In the case of import-turnover-taxation s. 21 ss. 2 applies.

Section 15 of the German VAT Act, Input Tax Deduction

(1) The entrepreneur is allowed to deduct the following input tax:

1.  The statutorily owed tax for delivery or other services carried out by a different company for his company.  A precondition for performing the deduction of input tax is that the entrepreneur is in the possession of an invoice issued in accordance with s. 14, s 14a. Should the separately stated tax amount be related to a payment made prior to effecting the turnover, it is already deductible if the invoice is on hand and payment has been made.

2.  Import-turnover-tax for goods imported for his company in accordance with s. 1 ss. 1 no. 4;

3.  Tax for the Intra-Community purchase of goods for his company, if the Intra-Community purchase was performed in accordance with s. 3d sentence 1 in Germany;

4.  Tax for services in the sense of s. 13b ss. 1 and 2 that were carried out for his company.  Should a tax refer to a payment before execution of this service, it can be deducted if payment has been made;

5.  Tax owed in accordance with s. 13a ss.1 no. 6 for turnover that was performed for his company.  Any delivery, import or Intra-Community purchase of goods which the entrepreneur uses for less that 10 percent for his company is not considered to be carried out for the company.

Section 18 of the German VAT Act, Taxation procedure

(1) The entrepreneur has until the 10th day after the expiry of the advance tax return period electronically to submit an advance tax return in the officially prescribed form according to the regulations of the tax-data-transfer act; in this he has to calculate the tax due for the advance return period (prepayment) by himself; upon application for the purpose of avoidance of unjust hardships the tax office can relinquish the use of electronic transfer. S. 16 ss. 1 and 2 and s. 17 apply accordingly.  Prepayment is due on the 10th day after expiry of the return period.

(2) Advance return period is the calendar quarter.  If the tax for the preceding quarter exceeds 6,139 Euro the advance return period is the calendar month.  If the tax for the preceding calendar year does not exceed 512 Euro the tax office can exempt the entrepreneur from the obligation to issue an advance return and relieve him from advances tax payment.  If the entrepreneur has executed his commercial or professional activity only in a part of the preceding calendar year, the actual tax has to be re-assessed into a tax amount covering a full year's period.  If the entrepreneur takes up his professional or commercial activities, then in the running and the following calendar year the advance return period is the calendar month.

(2a)  If the entrepreneur can instead of a calendar quarter select a calendar month as the advance return period, if in the preceding year a surplus of more than 6,139 Euro in his favour is generated.  In this case the entrepreneur has to file advance return covering the first calendar month until 10th of February of the current calendar year.  Exercising this selection right is binding the entrepreneur for the calendar year's time.

(3) The entrepreneur has to file tax return according to a legally prescribed form covering a year or a short taxation period and in this form to calculate by himself the payable tax amount or return amount generating in his favour, according to s. 6 s. 1 through 4 and s. 17 (tax return).  In the cases of s. 16 ss. 3 and 4 tax return has to be filed within one month after expiry of the shortened taxation period.  The tax return has to

28

be signed by the entrepreneur himself.

(4)  If in this form the entrepreneur calculates the tax or return in deviation from the advance payment amount, the difference in favour of the tax office is due one month after the receipt of the tax return.  If the tax office assesses the tax payable or the surplus in deviation from the tax return for one calendar year, the difference in favor of the tax office is due one month after notification of the tax assessment.  The usual due-dates of payable advanced payments (ss. 1) remain unaffected by sentences 1 and 2.

(4a) Advance return (subs 1 and 2) and tax return (subs 3 and 4) also have to be filed by entrepreneurs and legal bodies who have to exclusively pay taxes on turnovers as in s. 1 subs. 1 no. 5, s. 13b ss. 2 or s. 25b ss. 2 and by suppliers of vehicles (s. 2a).  Advance returns have to be filed only for the advance return periods in which tax on these turnovers has to be declared.  Application of ss. 2a is excluded.